IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02210-MSK-KLM

FRANKLIN JONES,

     Plaintiff,

v.

WELLS FARGO BANK, N.A., doing business as Wells Fargo Home Mortgage,

     Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on Plaintiff's **Motion for Default Judgment** [#17][1]

(the "Motion").  The Motion is referred to this Court for recommendation [#18].  In the

Motion the Plaintiff asks the Court to enter a default judgment against Defendant pursuant

to Fed. R. Civ. P. 55(b)(2).  *Motion* [#17] at 1.  No response has been filed to the Motion.

The Court has reviewed the Motion, the entire case file, and the applicable law, and is fully

advised in the premises.  Accordingly, for the reasons set forth below, the Court

**RECOMMENDS** that the Motion [#17] be **GRANTED**.

## I.  Factual and Procedural Background

     According to the Complaint, Plaintiff entered into two residential mortgage loan

transactions with Defendant in December of 2005.  *Compl.* [#1] ¶ 6.  The mortgages,

_____

[1] "[#17]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF).  This convention is used throughout the Recommendation.

executed as two promissory notes payable to Defendant, were for $161,000 ("Note 1") and $40,400 ("Note 2") (together, the "Notes."). *Id.* Plaintiff secured the Notes with property he owned located at 14707 E. 11th Ave., Aurora, Colorado 80011 (the "Subject Property"). *Id.* In October 2008, Plaintiff and Defendant "agreed to modify the terms of Note 1 to provide for a principal amount" of $170,382.99, with a maturity date of January 2036. *Id.* ¶ 8. Plaintiff alleges that at some point between October 2008 and 2010, Defendant "assigned and transferred all of its right, title, and interest in the [Notes] to HSBC Bank USA . . . ." *Id.* ¶ 9. After assigning the mortgage loans, Defendant "continued to service the loan[s] on behalf of HSBC by accepting payments and administering Plaintiff's escrow account." *Id.*

Plaintiff alleges that despite making "each and every payment to [Defendant] as stated in the promissory Note" and abiding "by each and every condition in the Notes and deeds of trust," Defendant erred in failing to properly account for such payments. *Id.* ¶ 12. This error, according to the Complaint, led to Defendant erroneously notifying Plaintiff that he was in default under the terms of the Notes in 2008. *Id.* On May 28, 2009, HSBC, having been assigned the right, title, and interest in the Notes, and having received erroneous notices of default, initiated foreclosure proceedings on the Subject Property. *Id.* ¶ 13. Plaintiff alleges that "[i]n order to settle the matter and assure that he was current under his obligations under both Notes, Plaintiff entered into two agreements with [Defendant] whereby [Defendant] would accept payment of the asserted [missed payments] over the course of several months." *Id.* ¶ 14. These agreements were called "Special Forbearance Agreements." *Id.*

However, Defendant continued to assert that Plaintiff had defaulted in his mortgage

payments. *Id.* ¶ 15.  In order to determine whether Plaintiff had defaulted, a Colo. R. Civ. P. 120 hearing was held in Arapahoe County District Court, Case No. 2009CV203367.  *Id.* Plaintiff alleges that the court "ruled that [Defendant] was in breach of contract, and also had breached the implied covenant of good faith and fair dealing . . . by filing the foreclosure action and engaging in conduct that prevented Plaintiff from making payments due under the Special Forbearance Agreements."  *Id.*  As such, an order authorizing sale of the Subject Property was set aside.  *Id.*  In July 2011, however, Plaintiff asserts that Defendant again insisted that there were missed payments and asserted that "Plaintiff was in default under the terms of the Notes and Special Forbearance Agreements."  *Id.* ¶ 16. On July 29, 2011, Defendant again filed a motion for order authorizing sale of the Subject Property.  *Id.*

However, Plaintiff alleges that in July 2011, he "was randomly selected to receive $50,000 in mortgage assistance pursuant to the Emergency Homeowners Loan Program ('EHLP')."  *Id.* ¶ 17.  With these new funds, Plaintiff alleges that he intended to fully "exercise his rights to cure" any existing defaults relating to payments on the Notes.  *Id.* ¶ 18.  As such, Plaintiff "filed his Intent to Cure with the Public Trustee, Arapahoe County, on August 17, 2011, asserting that he fully intended to exercise his rights to cure pursuant to the terms of the deed of trust and Colorado law."  *Id.* ¶ 18.  According to the Complaint, Defendant asserted that Plaintiff owed $62,742.98 under Note 1, and if Plaintiff would submit this amount by September 13, 2011, the pending foreclosure would be cured.  *Id.* ¶ 19.  After receiving the EHLP funds, Plaintiff alleges that he "had 100% of the funds necessary to cure," and Defendant's representatives assured Plaintiff that they were willing to work with him on curing the foreclosure.  *Id.* ¶ 20.

3

Plaintiff asserts that, under Colorado law, he "had the right to reinstate the mortgage loan . . . by paying . . . all sums that were in arrears [and] expenses incurred in enforcing the deed of trust, including attorneys' fees . . . ." *Id.* ¶ 25.  Pursuant to these rights, Plaintiff "notified [Defendant], as agent and servicer for HSBC, [of] his intent to apply the $50,000 EHLP funds to reinstatement and provide any further required amounts in cash." *Id.* ¶ 26. However, Plaintiff alleges that "[r]ather than cooperate, [Defendant] failed to return . . . numerous telephone calls from Plaintiff and the City of Aurora, and failed to communicate in writing that it would accept the EHLP funds as required by the program.  Instead, [Defendant] caused the Public Trustee to schedule the subject property for foreclosure auction.  This caused Plaintiff to become ineligible to receive the EHLP funds." *Id.* ¶ 21. In failing to cooperate, Plaintiff alleges that Defendant "actively interfered with and prevented [him] from delivering the full amount of the funds . . . in order to exercise his rights to cure and reinstate under the terms of the deed of trust . . . ." *Id.* ¶ 22.  According to the Complaint, Defendant "intentionally and improperly" represented to HSBC officials that Plaintiff had insufficient funds to cure the default on the Subject Property by "remain[ing] silent and fail[ing] to communicate and cooperate in the acceptance of EHLP funds." *Id.* ¶ 24.  Plaintiff asserts that as a result of Defendant's actions, the Subject Property was sold on February 8, 2012, and Plaintiff was then "forced out of his home." *Id.* ¶ 27.

In his Complaint, Plaintiff brings a single claim of intentional interference with contractual relations against Defendant.  Plaintiff asserts that Defendant, as the loan servicer, "was aware and had knowledge of the contractual relationship between Plaintiff and HSBC." *Id.* ¶ 29.  As such, Plaintiff alleges that Defendant knowingly and deliberately

failed to act and refused to cooperate with him in his attempts to avoid foreclosure of the Subject Property.  *Id.* ¶ 30.  Plaintiff asserts he had a "clearly viable" way to reinstate his mortgage loan, and in refusing to cooperate with him, Defendant's actions "had the direct and proximate effect of inducing or causing HSBC not to perform its contract with Plaintiff by not accepting Plaintiff's tender of reinstatement."  *Id.* ¶ 30.  Plaintiff claims damages "consisting of [the] loss of his home, loss of equity in his home, emotional distress, mental anguish, moving expenses, and attorney's fees and costs incurred in seeking to defend against HSBC's eviction actions."  *Id.* ¶ 34.

Plaintiff filed the Complaint on August 16, 2013.  Defendant was served with a copy of the summons and the Complaint on August 22, 2013.  *See Return of Service* [#7].  Defendant's answer or other response to the Complaint was due on or before September 13, 2013.  *See Summons* [#3].  To date, no answer has been filed on the docket, nor has Defendant requested an extension of time in which to do so.  Defendant has not appeared in this matter.

On September 18, 2013, Plaintiff filed a Motion for Entry of Default as to Defendant.  *See Motion for Entry of Default* [#14].  On September 19, 2013, the Clerk of the Court entered default as to Defendant [#16].  Following entry of default, Plaintiff filed the instant Motion [#17] seeking default judgment.

## II.  Analysis

Pursuant to Fed. R. Civ. P. 55(a), default may enter against a party who fails to appear or otherwise defend the case brought against it.  However, even after an entry of default, the Court must decide "whether the unchallenged facts create a legitimate basis for the entry of a judgment."  *See Greenwich Ins. Co. v. Daniel Law Firm*, No. 07-cv-2445-

LTB-MJW, 2008 WL 793606, at *1 (D. Colo. Mar. 22, 2008) (citations omitted). "[A] party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the 'sound judicial discretion' of the court." *Id.* at *2 (quoting *Cablevision of S. Conn., Ltd. P'ship v. Smith*, 141 F. Supp. 2d 277, 281 (D. Conn. 2001)).

Pursuant to Fed. R. Civ. P. 55(b), in considering the Motion, the decision to enter default judgment is "committed to the district court's sound discretion . . . ." *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003) (quotation omitted). When exercising that discretion, the Court considers that "[s]trong policies favor resolution of disputes on their merits." *Ruplinger v. Rains*, 946 F.2d 731, 732 (10th Cir. 1991) (internal quotation and citation omitted). Further, "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Id.* It serves to protect a plaintiff against "interminable delay and continued uncertainty as to his rights." *Id.* at 733.

## A.    Jurisdiction

In determining whether the entry of default judgment is warranted here, the Court must first consider whether the Court has subject matter and personal jurisdiction. *Dennis Garberg & Assocs. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997)*; Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986). The Court must do so in consideration of the well-established law that "a judgment is void if the court that enters it lacks jurisdiction over either the subject matter of the action or the parties to the action." *Williams*, 802 F.2d at 1203.

### 1.    Subject Matter Jurisdiction

Plaintiff asserts that the Court has subject matter jurisdiction over this lawsuit based on diversity jurisdiction. *See Compl.* [#1] ¶ 4. Diversity jurisdiction is governed by 28 U.S.C. § 1332(a), which provides in pertinent part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . (1) citizens of different states; [or] (2) citizens of a State and citizens of a foreign state." 28 U.S.C. § 1332(a). As relevant here, "[a]ll national banking associations shall . . . be deemed citizens of the States in which they are respectively located." 28 U.S.C. § 1348. In interpreting the term "located" in § 1348, the United States Supreme Court has refused to read the statute as "attribut[ing] to a national bank, for diversity jurisdiction purposes, the citizenship of each State in which the bank has established branch operations." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 313 (2006). Rather, for diversity jurisdiction purposes, a national bank is a citizen of the "State designated in its articles of association as its main office." *Id.* at 318; *see also Rouse v. Wachovia Mortg., FSB*, 747 F.3d 707, 709 (9th Cir. 2014) ("[U]nder 28 U.S.C. § 1348, a national bank is a citizen only of the state in which its main office is located.").

Here, Plaintiff asserts that he is a resident of Colorado, and that Defendant is a Delaware corporation with its main office in South Dakota. *Compl.* [#1] ¶¶ 1, 2. The Court notes that Defendant is a national bank. *See Rouse*, 747 F.3d at 709 ("Wells Fargo is a national bank, a 'corporate entit[y] chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury.'"). Additionally, Plaintiff attests that "[t]his action involves, exclusive of interest and costs, a sum in excess of $75,000." *Id.* ¶ 4. Therefore, complete diversity and an adequate amount in controversy are present, and the Court may exercise

7

subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a).

## 2.    Personal Jurisdiction

Before analyzing personal jurisdiction, the Court must first address the adequacy of service of process.  *See United States v. Elsberg*, No. 08-cv-00522-MSK-KLM, 2010 WL 5177439, at *2 (D. Colo. Aug. 17, 2010).  In the Motion, Plaintiff seeks entry of a default judgment against Defendant.  In the Complaint, Plaintiff asserts that Defendant is a company incorporated in Delaware.  *Compl.* [#1] ¶ 2.  Rule 4(h) of the Federal Rules of Civil Procedure applies to service of process on corporations.  That Rule states that a domestic corporation may be served "by delivering a copy of the summons and complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process . . . ."  Fed. R. Civ. P. 4(h)(1)(B).  On August 27, 2013, Plaintiff filed a Return of Service demonstrating that on August 22, 2013, a private process server personally served "Pamela Trujilo R/A: Corporation Service Company as Process Clerk for Wells Fargo Bank, N.A., D/B/A Wells Fargo Home Mortgage, at the address of: 1560 Broadway, Suite 2090, Denver, CO 80202 . . . ."  *See Return of Service* [#7].  The Court is satisfied that Plaintiff has used due diligence in serving Defendant.  Therefore, the Court finds that Plaintiff has obtained adequate service here and has satisfied Fed. R. Civ. P. 4(h).

Regarding personal jurisdiction, "[P]laintiff need only make a prima facie showing [of personal jurisdiction] if the motion [for default judgment] is decided only on the basis of the parties' affidavits and other written materials."  *Dennis Garberg & Assocs., Inc.*, 115 F.3d at 773.  In a diversity action, the Court may only exercise personal jurisdiction over

8

a non-resident defendant if: (1) the long-arm statute of Colorado permits personal jurisdiction in this case; and (2) the exercise of personal jurisdiction in Colorado comports with the Due Process Clause of the United States Constitution. *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1276 (10th Cir. 2005); *see also Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008); *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995) ("To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state[.]"). The Supreme Court of Colorado interprets Colorado's long-arm statute "to confer the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions." *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005). Accordingly, because a due process analysis of jurisdiction in this case will also satisfy Colorado's long-arm statute, the Court need only consider whether the exercise of personal jurisdiction over Defendant is permitted by the Due Process Clause. *SCC Commc'ns v. Anderson*, 195 F. Supp. 2d 1257, 1260 (D. Colo. 2002) ("[The] analysis turns on a single inquiry, whether the exercise of personal jurisdiction over [the defendant] comports with due process."); *Dudnikov*, 514 F.3d at 1070 ("[T]he first, statutory, inquiry effectively collapses into the second, constitutional, analysis.").

The Due Process Clause requires that the Court conduct a two-step analysis of personal jurisdiction. First, the Court must examine "whether the non-resident defendant has 'minimum contacts' with the forum state such that [it] should reasonably anticipate being haled into court there." *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007) (citation and quotation mark omitted). Second, if the

9

defendant has sufficient contacts, the Court then asks "whether the court's exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice,'" that is, whether the exercise of jurisdiction is "reasonable" under the circumstances. *Id.* (citation and some quotation marks omitted).

### a.     Minimum Contacts

The "minimum contacts" requirement of due process may be met by showing the existence of general or of specific jurisdiction. *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996). The requisite minimum contacts exist if the non-resident defendant has continuous and systematic contacts with the forum state (general jurisdiction) or if the defendant (i) has purposefully directed activities at forum residents or otherwise acted to avail itself purposefully of the privilege of conducting activities there and (ii) the litigation results from alleged injuries that arise out of or relate to those activities (specific jurisdiction). *Impact Prods. Inc. v. Impact Prods.*, LLC, 341 F. Supp. 2d 1186, 1190 (D. Colo. 2004). In short, Defendant must have purposely established minimum contacts with the forum state such that it "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

To determine whether specific jurisdiction over Defendant is appropriate, the Court must examine whether: (1) Defendant purposefully directed its activities at Colorado or its residents or acted in some other way by which it purposefully availed itself of the benefits and protections of conducting business in Colorado, and (2) Plaintiff's claims arise out of or relate to Defendant's forum-related activities. *Impact Prods.*, 341 F. Supp. 2d at 1190. The aim of the "'purposeful direction' doctrine has been said by the Supreme Court to [be

10

to] ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 475).   The defendant must therefore have "deliberately" created some relationship with the forum state that would serve to make that state's potential exercise of jurisdiction foreseeable.  *Burger King*, 471 U.S. at 475-76.

Here, Defendant has purposefully directed itself of the privilege to conduct activities in Colorado such that the prospect of being haled into court here was foreseeable.  Specific personal jurisdiction "is satisfied when a defendant acting outside of the forum state executes a promissory note that expressly obligates payment to a resident inside the forum state." *Alameda Nat'l Bank v. Kanchanapoom*, 752 F. Supp. 367, 369 (D. Colo.  1990); *Kingston v. Brussat*, 698 F. Supp. 215, 216 (D. Colo. 1988); *Tucker v. Vista Fin. Corp.*, 560 P.2d 453, 455 (Colo. 1977).  The Complaint alleges that since at least 2005, Defendant has dealt with Plaintiff regarding mortgage-related activities, either as holder or servicer of the Notes.  *See Compl.* [#1] ¶¶ 6-16.  Issuing a mortgage to a borrower in Colorado and subsequently servicing the same mortgage in Colorado after assignment indicates Defendant's intent to avail itself of the privileges of acting in Colorado.  Thus, Defendant had clear reason here to foresee being haled into a Colorado court to defend a suit related to the Notes.  Finally, the Court finds that this litigation arises out of Defendant's activities in Colorado.  *See Impact Prods.* 341 F. Supp. at 1190.  The Court therefore finds that Defendant had minimum contacts with the forum state of Colorado.

### b.    Traditional Notions of Fair Play and Substantial Justice

Additionally, the Court finds that exercising jurisdiction over Defendant does not "offend traditional notions of fair play and substantial justice." *Impact Prods.*, 341 F. Supp.

2d at 1190.   Regarding "traditional notions of fair play and substantial justice," courts consider: (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies. *Dudnikov*, 514 F.3d at 1080 (citation omitted).   The Court addresses each of these factors in turn.   First, the Court's exercise of jurisdiction over Defendant would not create an undue burden on Defendant.   "[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern . . . . [I]n this age of instant communication, and modern transportation, the burdens of litigating in a distant forum have lessened." *Peay v. Bellsouth Med. Assistance Plan*, 205 F.3d 1206, 1212-13 (10th Cir. 2000) (citations, quotations, and footnote omitted).   By designating Corporation Service Company as its registered agent in Colorado, Defendant has made the judicial system of Colorado very convenient to access.   Therefore, requiring Defendant to defend this action in Colorado would not create an undue burden.

Second, "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1096 (10th Cir. 1998).   Plaintiff alleges that the Subject Property at issue is located within this District and the mortgage payments giving rise to the foreclosure accrued in this District. *Compl.* [#1] ¶ 6.   Therefore, any injury to Plaintiff occurred in Colorado.   Accordingly, Colorado has an important interest in providing a forum for Plaintiff to seek redress for his alleged injuries.

The third factor "hinges on whether the [p]laintiff may receive convenient and

effective relief in another forum," *Benton*, 375 F.3d at 1079, and the fourth factor asks "whether the forum state is the most efficient place to litigate the dispute." *Id.* at 1080 (quotations and citation omitted).  In this case, Colorado is the most efficient forum to litigate this dispute because the Subject Property is located in Colorado. *Compl.* [#1] ¶ 6. Therefore, the third and fourth factors weigh in favor of exercising personal jurisdiction over Defendant in Colorado.

The fifth factor "focuses on whether the exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign nations." *Dudnikov*, 514 F.3d at 1080 (quotations and citations omitted).  Exercising personal jurisdiction over Defendant in Colorado furthers the policy interests of all states in the protection of citizens in cases of purported tortious interference.  Accordingly, the Court recommends finding that exercising jurisdiction over Defendant does not "offend traditional notions of fair play and substantial justice," and that the Court may exercise personal jurisdiction over Defendant as a non-resident defendant.  Therefore, the Court is satisfied that it may exercise personal jurisdiction in this matter.

**B.    Entry of Default**

As a threshold issue, the Court confirms the propriety of entry of default.  Fed. R. Civ. P. 55(a) prescribes that "the clerk must enter the party's default" if "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Plaintiff initiated this lawsuit on August 16, 2013. *See Compl.* [#1].  On August 27, 2013, Plaintiff filed a Return of Service by a private process server for Defendant. *See Return of Service* [#7].  The server stated, under penalty of perjury, that he personally served "Pamela Trujillo R/A: Corporation Service Company," the registered agent for Defendant.

13

*See id.*  Defendant was properly served, and its answer or other response to Plaintiff's

Complaint was due on or before September 13, 2013.  *Motion* [#17].  Defendant did not

answer or otherwise respond or appear in this matter at all.  On September 18, 2013,

Plaintiff filed a Motion for Entry of Default [#14] and on September 19, 2013, the Clerk of

the Court entered default as to Defendant [#16].  Defendant has failed to respond to the

entry of default.

Defendant has "failed to plead or otherwise defend" this lawsuit.  *See* Fed. R. Civ.

P. 55(a); *see also State Res. Corp. v. Sirios*, 10-cv-00243-PAB-MJW, 2011 WL 318754,

at *2 (D. Colo. Jan. 28, 2011) (holding that entry of default was proper when "[d]efendant's

failure to respond [had] thwarted the ability of the Court to resolve the matter on the

merits").  Accordingly, the Court finds that the entry of default against Defendant was

proper.

## C.   Default Judgment

After confirming the propriety of the entry of default, the Court must decide "whether

the unchallenged facts create a legitimate basis for the entry of a judgment."  *Greenwich*

*Ins. Co.*, 2008 WL 793606, at *1 (citations omitted).  "'[T]he default judgment must normally

be viewed as available only when the adversary process has been halted because of an

essentially unresponsive party.  In that instance, the diligent party must be protected lest

he be faced with interminable delay and continued uncertainty as to his rights.  The default

judgment remedy serves as such a protection.'"  *In Re Rains*, 946 F.2d 731, 733-34 (10th

Cir. 1991) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d

689, 691 (D.C. Cir. 1970)).

Upon review of a motion for default judgment, assuming default was properly

entered, the moving party enjoys the benefit of deferential pleading interpretation.  The

Court deems the well-pled facts (as opposed to merely conclusory statements) of the

Complaint in this matter to be true.  *Id.* at *1 (citing *Dundee Cement Co. v. Howard Pipe &

Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).  The Court also accepts as

undisputed any facts set forth by the moving party in affidavits and exhibits.  *Id.*

Thus, the Court must determine whether the allegations contained in Plaintiff's

Complaint are sufficient to state a claim for relief.  To state a claim for relief, the Complaint

must contain sufficient factual matter, accepted as true, to show that the claim is plausible

on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow

the court to reasonably infer that the defendant is liable for the alleged conduct.  *Id.*  A

pleading that offers mere legal conclusions, or a recitation of the elements of a cause of

action, is insufficient.  *Id.*

### 1.    Intentional Interference With Contractual Relations

In the Motion, Plaintiff asserts that the allegations contained in the Complaint are

sufficient to establish a claim for intentional interference with contractual relations.  *Motion*

[#17] ¶ 8.  For claims of intentional interference with contractual relations, courts in

Colorado rely on § 766 of the Restatement (Second) of Torts (1977), which provides:

> One who intentionally and improperly interferes with the performance of a
> contract . . . between another and a third person by inducing or otherwise
> causing the third person not to perform the contract, is subject to liability to
> the other for the pecuniary loss resulting to the other from the failure of the
> third person to perform the contract.

*See Trimble v. City & Cnty. of Denver*, 697 P.2d 716, 725-26 (Colo. 1985), *superseded on

other grounds by* Colo. Rev. Stat. § 24-10-105 (2011).  "To prove [intentional interference

with contractual relations], a plaintiff must show that: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result." *Dawson v. Litton Loan Servicing, LP*, No. 12-cv-01334-CMA-KMT, 2013 WL 1283848, at *6 (D. Colo. Mar. 28, 2013) (citing *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004)).   To be actionable, "an interference with the performance of a contract must also be improper." *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984); *see also Colo. Nat'l Bank v. Friedman*, 846 P.2d 159, 170 (Colo. 1993).   The Colorado Court of Appeals recently stated that a "defendant's conduct short of causing breach or total impossibility of performance can be actionable under the theory of intentional interference with contractual relations." *Slater Numismatics, LLC v. Driving Force, LLC*, 310 P.3d 185, 194 (Colo. App. 2012); *see also Ecco Plains, LLC v. U.S.*, 728 F.3d 1190, 1198-99 (10th Cir. 2013) (examining the role of the Restatement (Second) of Torts § 766 in Colorado for claims of intentional interference with contractual relations).

### a.   Application

In light of these principles, the Court has reviewed the Complaint and is satisfied that it sets forth a viable cause of action against Defendant under Colorado law.   Here, Plaintiff alleges that "[Defendant] assigned and transferred all of its right, title, and interest in the two mortgage loans to HSBC . . . ." *Compl.* [#1] ¶ 9.   The Complaint also asserts that "[Defendant] continued to service the loan on behalf of HSBC by accepting payments and administering Plaintiff's escrow account." *Id.*   Moreover, the Complaint states that Defendant "knew of the existence of the mortgage contracts." *Id.* ¶ 11.   Thus, the Court

16

finds that a valid contract existed between Plaintiff and HSBC and that Defendant had knowledge of the contract, satisfying the first two elements of a claim for intentional interference of contractual relations under Colorado law. *See Dawson*, 2013 WL 1283848, at *6.

The third element of a claim for intentional interference of contractual relations requires that Defendant interfered and induced HSBC to breach its contract with Plaintiff. *Id.* As pertinent here, Plaintiff alleges that HSBC was contractually obligated to allow him an opportunity to cure any deficiencies and reinstate his mortgage, and that this obligation stemmed from the deed of trust. *See Compl.* [#1] ¶ 25. According to the Complaint, this right could have been exercised by "paying HSBC (or Wells Fargo as servicer for HSBC) all sums that were in arrears, expenses incurred in enforcing the deed of trust, including attorneys' fees, on or before the period specified under Colorado law for reinstatement." *Id.* Plaintiff also asserts that Defendant knew the amount that Plaintiff owed under Note 1 and payment of these funds "would cure the foreclosure." *Id.* ¶ 19. Plaintiff alleges that Defendant was aware of a source of funds, i.e., the EHLP assistance funds, which would allow Plaintiff to cure any payments in arrears to HSBC. *See id.* ¶ 20 ("[Defendant]'s representatives assured Plaintiff that 'we will work with you on that,' referring to acceptance of the EHLP funds toward cure and reinstatement of Note 1."); *see also id.* ¶ 26 ("Plaintiff tendered reinstatement pursuant to the terms of the deed of trust by notifying [Defendant], as agent and servicer for HSBC, [of] his intent to apply the $50,000 EHLP funds to reinstatement and provide any further required amounts in cash."). The Complaint asserts that despite knowledge of such funds, Defendant refused to cooperate and "failed to return . . . numerous telephone calls . . . and failed to communicate in writing that it would accept

17

the EHLP funds as required by the program.   Instead, [Defendant] caused the Public Trustee to schedule the subject property for foreclosure auction.  This caused Plaintiff to become ineligible to receive the EHLP funds."   *Id.* ¶ 21.   Indeed, Plaintiff alleges that Defendant caused HSBC to fail to accept the EHLP funds by "intentionally and improperly representing that Plaintiff had not tendered reinstatement and did not have the funds to reinstate."  *Id.* ¶ 24.  Taking Plaintiff's allegations as true, *see Greenwich Ins. Co.*, 2008 WL 793606, at *1, the Court finds that, as servicer of the mortgage loans, Defendant's actions in refusing to communicate to HSBC the existence of the EHLP funds at least interfered with HSBC's contractual duty to allow Plaintiff a chance to cure an existing default in his mortgage payments.  Thus, the Court finds that the third element of a claim for intentional interference with contractual relations is satisfied.

Finally, Plaintiff has sufficiently alleged facts that Defendant's conduct was wrongful under *Memorial Gardens, Inc. v. Olympiano Sales & Mgmt. Consultants, Inc.*, 690 P.2d at 210, and that Plaintiff was injured by Defendant's conduct.   *See Dawson*, 2013 WL 1283848, at *6.  The impending foreclosure of one's home implicates substantial interests, and when an actor inexplicably refuses to engage in simple, routine communication regarding a significant source of funds which has the potential to avoid or at least delay such a foreclosure, a wrongful act has occurred.  *See Slater Numismatics*, 310 P.3d at 195 (discussing the elements of wrongfulness in the context of the Restatement (Second) of Torts § 767).  Considering that Defendant was aware that "the total amount [in arrears] owed under the terms of Note 1" was $62,742.98, *see Compl.* ¶ 19, and that Plaintiff was eligible to receive $50,000 in EHLP funds, the Court finds that Defendant knew that its lack of proper communication "was certain or substantially certain to" interfere with the

18

performance of Plaintiff's contract with HSBC.[2]  *See Slater Numismatics*, 310 P.3d at 194.

Regarding the alleged injury, Plaintiff asserts that as a result of Defendant's actions, he has

been injured in losing his home, suffering emotional distress, and expending resources to

recover his home.  *See Compl.* [#1] ¶ 34.  Thus, the Court finds that Plaintiff has sufficiently

alleged facts that Defendant's conduct was wrongful and that Plaintiff was injured as a

result.

Because all of these well-pleaded factual allegations in the Complaint are deemed

admitted by virtue of Defendant's default, and because they are sufficient to state a claim

under Colorado law, the Court finds that Defendant is liable to Plaintiff for intentional

interference with contractual relations.

### 2.     Damages

In addition to finding that Plaintiff has a basis for relief, default judgment cannot be

entered until the amount of damages has been ascertained.  *See Herzfeld v. Parker*, 100

F.R.D. 770, 773 (D. Colo. 1984).  Actual proof must support any default judgment for

money damages where there is an uncertainty as to the amount.  *Klapprott v. United

States*, 335 U.S. 601, 611-12 (1949).  This requirement ensures that a plaintiff is not

awarded more in damages than can be supported by actual evidence.  *See id.*  The Court

accepts as undisputed any facts set forth by the moving party in affidavits and exhibits.  *Id.*

Pursuant to Fed. R. Civ. P. 54(c), "[a] default judgment must not differ in kind from, or

exceed in amount, what is demanded in the pleadings."  Further, "[a]lthough upon default

---

[2]  The Court recognizes that the EHLP funds were short of meeting the total amounts in arrears.  In his Affidavit in support of the Motion, Plaintiff asserts that "[w]ith the $50,000 EHLP funds, I had 100% of the funds necessary to cure [Defendant]'s claim of default and keep my home ($62,742.98)."  *Aff. of Pl.* [#17-3] ¶ 10.

the factual allegations of a complaint relating to liability are taken as true, those allegations relating to the amount of damages suffered ordinarily are not." *Dundee Cement Co. v. Howard Pipe & Concrete Prods. Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983).  Pursuant to Fed. R. Civ. P. 55(b), "[t]he Court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . (B) [d]etermine the amounts; (C) [e]stablish the truth of any allegation by evidence; or (D) [i]nvestigate any other matter."

For intentional interference with contractual relations claims, the Colorado Supreme Court has referred with approval to the measure of damages set out in the Restatement (Second) of Torts § 774(A).  *See id.*; *see also Trimble*, 697 P.2d at 730; *Mem'l Gardens*, 690 P.2d at 212.  Section 774(A) provides:

> (1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
> (a) the pecuniary loss of the benefits of the contract or the prospective relation;
> (b) consequential losses for which the interference is a legal cause; and
> (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

*Id.*

Since a claim asserting intentional interference with contractual relation is a tort rather than a contract claim, "[t]he measure of damages may . . . depart from contractual damages when necessary to make the innocent party whole." *Westfield Dev. Co., v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1120 (Colo. 1990) (citing *Hein Enters., Ltd. v. San Francisco Real Estate Investors*, 720 P.2d 975, 981 (Colo. App. 1985)).  "Worded another way, 'the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.'" *Bd. of Cnty. Comm'rs of Weld Cnty. v. Slovek*, 723 P.2d 1309, 1314 (Colo. 1986) (quoting the Restatement (Second) of Torts § 901 cmt.

20

a).

### a.   Application

In his Complaint, Plaintiff alleges that "[a]s the proximate result of [Defendant]'s interference with HSBC's performance under the mortgage contracts, [he] has been damaged consisting of [the] loss of his home, loss of equity in his home, emotional distress, mental anguish, moving expenses, and attorneys fees and costs incurred in seeking to defend against HSBC's eviction actions." *Compl.* [#1] ¶ 34.   The Complaint states that Plaintiff is seeking "damages in the sum of $250,000 . . . ." *Id.*   In the Motion, Plaintiff asserts that his affidavit and other evidence supports an award of damages in the amount of $203,248.   *See Motion* [#17] ¶ 18.   In his affidavit in support of the Motion, Plaintiff asserts damages in the amounts of $165,000 for value of the Subject Property, $8,697.88 in legal bills to defend himself and his home, $2,228 in increased taxes resulting from the loss of his mortgage interest deductions, $3,500 in moving expenses after being forced out of his home, and $25,000 stemming from the emotional distress Plaintiff suffered "as a result of [Defendant]'s actions."   *See Motion* [#17] ¶ 16.   The Court will address each request in turn.

Plaintiff asserts that as a result of Defendant's tortious conduct, he lost his home and any future equity derived therefrom.   *See Aff. of Pl.* [#17-3] ¶¶ 16a-c.   Plaintiff alleges that Defendant's "deliberate failure to cooperate in procuring the EHLP funds" not only caused the loss of his home, but also caused Plaintiff to be "unable to qualify for and obtain sufficient credit to purchase a comparable home . . . ." *Id.* ¶ 16-a.   Further, Plaintiff asserts that "[b]ecause [he] will be forced to rent at equivalent monies to the lost mortgage, [his] ultimate loss is the corresponding equity, i.e., the full value of the home as of the present

day." *Id.* ¶ 16-c.   The Court recognizes that, here, one "benefit of the contract[ ],"
Restatement (Second) of Torts § 774(A)(1)(a), is the equity a mortgagor builds in a
property when he makes each monthly payment.   However, according to the Complaint,
Note 1 had a "maturity date of January 2036, and a monthly payment of $1,413.43."
*Compl.* [#1] ¶ 8.   Thus, Plaintiff would not have achieved the full equity in the Subject
Property until the year 2036.   Awarding Plaintiff, in 2014, the full value of the equity he
would have achieved in the year 2036 would not put Plaintiff in the same position he was
in prior to Defendant's intentional interference.   Rather, it would put Plaintiff in the position
he would be in if he diligently made his mortgage payments for at least the next twenty
years.   For the reasons set forth below, the Court is unwilling to award such an amount in
damages.

According to the Complaint, the Subject Property was foreclosed on February 8,
2012.   *Compl.* [#1] ¶ 27.   In his Affidavit in support of the Motion, Plaintiff asserts that "the
market value of the [Subject Property as of July 2, 2013 was] $165,000," and that "the
value of the [Subject Property was] $146,000 according to market conditions as of the day
of the foreclosure."   *Aff. of Pl.* [#17-3] ¶ 16-a.   The Court accepts Plaintiff's figure of
$146,000 for the value of the Subject Property as of February 8, 2012.   *See Klapprott*, 335
U.S. at 611-12.   However, the Court must also take into account the rest of the
circumstances surrounding Plaintiff and the Subject Property as alleged in the Complaint.
For example, the Complaint states that Plaintiff executed two promissory notes, secured
by the Subject Property, in the amounts of $161,600 (Note 1) and $40,400 (Note 2), in
December 2005.   *See Compl.* [#1] ¶ 6.   In addition, Note 1 was modified "to provide for a
principal amount [of] $170,382.99" in October 2008.   *Id.* ¶ 8.   Thus, when the Subject

22

Property was foreclosed in February 2012, Plaintiff likely owed more than $200,000 under Notes 1 and 2 secured by a property worth approximately $146,000.[3]  This means that Plaintiff likely had no equity in the Subject Property in February 2012.[4]  As such, the Court finds that it would be inappropriate to award Plaintiff any equity, much less the $165,000 he seeks as lost equity, in the Subject Property, as this would do much more than place Plaintiff in a position "equivalent to his position prior to the tort."  *See* Restatement (Second) of Torts § 901 cmt. a.  Therefore the Court awards no damages to Plaintiff in the form of lost equity stemming from the foreclosure of the Subject Property.

Plaintiff is also claiming damages of $2,228, which reflects the amount his taxes increased, over two years, as a result of losing his mortgage interest deductions, and is also claiming damages of $3,500 for "moving expenses" incurred when he "was forced out of [his] home."  *See Aff. of Pl.* [#17-3] ¶¶ 16-b, 16-e.  Considering that the mortgage deductions to Plaintiff's tax liability constitute a "benefit of the contract," *see* Restatement (Second) of Torts § 774(A)(1)(a), the Court finds that awarding Plaintiff $2,228 is proper.  Similarly, the Court finds that awarding Plaintiff $3,500 is also proper, since the asserted moving expenses are "consequential losses for which the interference is a legal cause."

---

[3]  Thus, it appears that this was an "underwater" loan.  *See Grillo v. JP Morgan Chase & Co.*, No. 13-cv-03233-RBJ-KLM, 2014 WL 2442613, at *1 n. 2 (D. Colo. Apr. 8, 2014) ("An underwater mortgage loan is a home purchase loan with a higher balance than the free market value of the home . . . .  This situation prevents a homeowner from selling the home unless he has cash to pay the loss out of pocket . . . .  If the homeowner wants to sell the home because he cannot afford the mortgage payments anymore, the home falls into foreclosure unless the borrower can renegotiate the loan.").

[4]  In the context of real estate, equity is the difference between the current market value of the property and the amount the owner still owes on the mortgage.  INVESTOPEDIA.COM, "Equity," http://www.investopedia.com/terms/e/equity.asp.  It is the amount that the owner would receive after selling a property and paying off the mortgage.  *Id.*

*See id.* § 774(A)(1)(c).

Plaintiff further asserts damages in the amount of $8,697.88, for "legal bills" incurred "to defend [himself] and [his] home." *Motion* [#17-3] ¶ 16-d. Plaintiff has provided account statements from law firms in support of this assertion. *See Aff. of Pl.* [#17-7] at 2-5. Specifically, Plaintiff asserts that attorney's fees are a consequential damage of Defendant's tortious conduct and are therefore permitted. *See Motion* [#17] ¶¶ 16, 17 (citing *Westfield Dev.*, 786 P.2d at 1120). Under Colorado law, "[a]s a general rule, and in the absence of any contractual or statutory liability therefor, attorneys' fees and expenses of litigation of a plaintiff's claim are not recoverable as an item of damages either in a contract or tort action." *Beebe v. Pierce*, 521 P.2d 1263, 1264-65 (Colo. 1974); *see also Double Oak Constr., LLC v. Cornerstone Dev. Int'l, LLC*, 97 P.3d 140, 150 (Colo. App. 2003). However, "'[w]hen the natural and probable consequence of a wrongful act has been to involve plaintiff in litigation with others, the general rule is that the reasonable expenses of the litigation may be recovered from the wrongdoer.'" *Alexander Co. v. Packard*, 754 P.2d 780, 782 (Colo. App. 1988) (quoting *Int'l State Bank of Trinidad v. Trinidad Bean & Elevator Co.*, 245 P. 489 (Colo. 1926)); *see also Signer v. Pimkova*, 2007 WL 4442327, at *7 (D. Colo. Dec. 14, 2007) ("Colorado [allows] the recovery of attorney's fees as general damages where the incursion of such fees naturally flows from the commission of the tort involved."). Here, Defendant's actions were such that "the natural and probable consequence" was for Plaintiff to incur litigation in order to recover his asserted damages. As discussed above, the prospect of losing one's home implicates substantial interests and hiring an attorney naturally flows when a homeowner believes his home has been unjustly foreclosed as a result of another's tortious conduct. Accordingly,

the Court finds that attorney's fees are recoverable against Defendant pursuant to Plaintiff's tortious interference claim in the amount of $8,697.88.

In the Motion, Plaintiff states that he has and continues "to suffer emotional distress and mental anguish as the result of [Defendant]'s actions. During relevant times, [he] experienced humiliation, frustration, anxiety and sleeplessness, the value of which is $25,000." *Aff. of Pl.* [#17-3] ¶ 16-f. As indicated above, damages for emotional distress are recoverable under a claim for intentional interference with contractual relations. *See* Restatement (Second) of Torts § 774(A)(1)(c); *see also Westfield Dev.*, 786 P.2d at 1121 ("As a general rule, emotional distress damages may be recovered in an action for intentional interference with contract . . . but only if they are reasonably to be expected to result from the interference.") (citing *Trimble*, 697 P.2d at 730). However, Plaintiff's assertions here are not sufficient to provide a reasonable basis to determine an amount of damages for his claimed emotional distress. Plaintiff provides no details of any kind about his claimed emotional distress, including the form, timing, duration, and frequency of his claimed distress, or whether he sought treatment for his claimed distress. Such conclusory, general, and uncorroborated testimony concerning emotional distress is not sufficient to support an award of damages for emotional distress. *See Dill v. City of Edmond, OK*, 155 F.3d 1193, 1209 (10th Cir. 1998) (holding that the plaintiff's statement that transfer was "very upsetting," that everything he worked for "was taken away," and that some people would not associate with him because of transfer was not sufficient to prove emotional distress); *see also Koopman v. Water Dist. No. 1 of Johnson Cnty., Kan.*, 41 F.3d 1417, 1420 (10th Cir. 1994) (denying claim for damages for emotional distress where there was no evidence to corroborate the plaintiff's testimony as to his mental state). When

a plaintiff's testimony is the only evidence of emotional damages, the plaintiff "'must explain the circumstances of his injury in reasonable detail'" and not rely on conclusory statements, unless the "'facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action.'" *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004), *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56 (2007) (quoting *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003)).  The Court concludes that as a matter of law, the facts described by Plaintiff are not so inherently degrading that those facts, by themselves, support a reasonable inference that Plaintiff suffered emotional distress from Defendant's actions.  *See Kittle v. Accredited Collection Agency, Inc.*, No. 07-cv-01716-REB-BNB, 2010 WL 2650479, at *2 (D. Colo. June 30, 2010) (refusing to support a reasonable inference that a plaintiff had suffered emotional distress where an affidavit merely stated that plaintiff "was extremely upset, suffered emotional distress including excessive stress, headaches, fear, sleeplessness, loss of appetite, withdrawal from social situations and depression" stemming from a Fair Debt Collection Practices Act claim).  Thus, the Court concludes that Plaintiff is not entitled to an award of damages for emotional distress.

To summarize, the Court concludes that Plaintiff is entitled to damages of $2,228 for the lost benefits of mortgage interest deductions, $3,500 for moving expenses, and $8,697.88 for attorney's fees.  The sum total of these amounts is $14,425.88.

### III.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Plaintiff's Motion for Default Judgement [#17] be **GRANTED** and that judgment enter against Defendant in the amount of $14,425.88.

IT IS HEREBY **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  July 1, 2014

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge